ORA MAE KESSLER, Appellant, v. HALBERT ROBBINS, Appellee.

No. 41563.

NOVEMBER 22, 1932.

328

C. Woodbridge and Devitt, Eichhorn & Devitt, for appellant.

Hallagan, Stewart & Fountain and David, Jones & David, for appellee.

Evans, J.—The plaintiff was a child a little less than seven years of age at the time of the accident. She was in company with Phyllis Young, another child between nine and ten years of age. The accident happened on February 24, 1930, on East University Avenue and near its junction with East 38th street. This highway is known also as Primary Highway No. 63. East 38th street is located near the eastern limits of the city of Des Moines. It extends north from East University Avenue, but does not extend south thereof. These two little girls lived a short distance from this intersection. They had just come to the place in a school bus, which had discharged them at this point. On the south side of the avenue and a little west of the intersection, is a group of mail boxes. One of these belonged to the parents of Phyllis and she looked for mail therein. At one end of this line of mail boxes they stood hand in hand watching the passing cars and waiting for a safe opportunity to cross to the north side in the direction of their homes. They were two or three feet distant from the south edge of the pavement. Among the passing cars was that of the defendant, who came from the west. His car was occupied by himself and his brother. He was driving on the south side of the pavement with his right wheels at a distance of eighteen inches from the edge of the pavement. Under his testimony he had slowed down to fifteen miles an hour as he approached the place of the accident. At a distance of five feet in front of him the plaintiff suddenly started to cross the street. She had not noticed the approach of the car. Nor had Phyllis noticed it. So far as the circumstances of the accident are concerned, the plaintiff rested her case upon the testimony of herself and of Phyllis. Inasmuch as they had not observed the approach of the car they were unable to testify to any of the circumstances other than the fact of the collision and the injury. They did not testify to the speed of the car, nor to any other act of alleged negligence on the

part of the defendant, except as negligence might be inferred from the circumstances here stated. In this state of the evidence, and after plaintiff rested, the defendant presented a motion for a directed verdict. This motion was denied by the court. This ruling was not consistent with his later ruling, but was doubtless made in the expectation of getting more light upon the circumstances of the accident by requiring the defendant to disclose the circumstances that were within his knowledge. Thereafter at the close of all the evidence a verdict was directed for the defendant. The question therefore presented for our consideration is whether upon this whole record a verdict for the plaintiff could stand, if rendered by the jury.

The evidence is comparatively brief and we can present it in the record quite as conveniently by quoting the material parts thereof so far as they present a conflict between the respective witnesses. Phyllis Young testified:

"The mail boxes are towards the west from 38th Street and we went over there and looked in the mail box and then we waited for cars to go past and some went past. We were standing right by the mail boxes, straight west from the mail boxes. The mail boxes are two and a half to three feet from the south edge of the pavement. We stood facing north. Ora Mae was on the east side of me on my right side. We stood there quite a little while and just waited and I first looked west and I did not see any cars coming. A little ways west of us there was the top of a hill. I did not see any cars coming between us and the top of that hill. I then looked east and then back west and then there was a car came right past me, in front of me, and I heard Ora Mae's lunch pail. I looked over there on the other side of the street and Ora Mae was hit and her pail was out on the pavement and Ora Mae was over by a telephone post on the east side of 38th street and on the north side of University Avenue. She was east of me and across the pavement from me and she was lying down and the car that struck her, at that time, was over by Boyce's mail box about a half a block east. That is where this car stopped. The car did not stop between the time it passed in front of me until the time it got down to Boyce's mail box. This car did not blow or sound any horn. I went across the street to Ora Mae, to where she was lying, and I waited until another car came. I said, 'Ora Mae, Ora Mae.' She rolled over. Another car came from the east and stopped by her and a man got out from that car and then

I ran up and told my mother and she went over to Mrs. Kessler's. I next saw Ora Mae in her mother's arms. A man carried her up a little way and Mrs. Kessler met them and took Ora Mae. When Ora Mae laid there by the telephone pole she was off the pavement lying on the dirt. She was carried there by the car. No one picked her up and laid her over there. I did not see the car hit Ora Mae. The first time I saw the car it was going past me. When I looked west and then looked east and then looked back west again was when this car was just passing in front of me. When I looked west then when I looked east Ora Mae was standing right there by me. When I turned my head to the west was when this car went past me. I looked around and something went past me *real fast*. The first I saw of Ora Mae after the car struck her she was lying over by the telephone post. She was not lying on the pavement at all. No one picked her up from the time this car passed until she was lying over there by the telephone pole. Nobody touched her but me.

### "Cross-examination.

"I am ten years old. When I was over there by the mail box cars were coming along there on the pavement. That is the reason that Ora Mae and I stopped, was for the cars to go by. We stood there a little while. I told Ora Mae not to go across until I did. She was standing there right beside me. I had hold of her hand. She did not pull away from me; I just let loose after I looked and didn't hardly get my hand loose until the car slashed right by me. We were standing by the mail box off the pavement back about two or three feet. I looked to the west to the top of the hill. It is about two blocks. When I looked I did not see any car within that two blocks. I did not see any sign of a car. It was a very short time after I looked to the·west that I heard this dinner pail. I thought Ora Mae had dropped her lunch pail. I did not see her up around or against the car. First I looked west then east and then west again and just as I turned my head there was something squeezed past me and just in the short time I had been looking east. I did not go out into the pavement where Ora Mae was, I went clear across the street. She wasn't out on the pavement. *This man [defendant] did not pick her up. I did not see him around there.* I saw another car drive up and a man got out. It came the other way. I did not see the man carry her up to her house. I don't know who carried her up; I went after. Mrs. Kessler. I went over where Ora

Mae was. I did not run home, I waited for another car to come. There was another car came up there before I left. I did not see the car hit Ora Mae. The last time I saw her she was standing right beside me."

The plaintiff testified:

"The mail box is on the south side of University and a little west from 38th Street and Phyllis and I went over there. She looked in the box and then we watched for some cars to go by. I was standing east of Phyllis just west of the mail box. I was standing off the pavement on the dirt, and watched some cars go by and then I looked around Phyllis and first I looked west then I looked east and while I was looking east for the cars Mr. Robbins came over the hill and hit me *when I stepped onto the street*. When I stepped on the street I only stepped on the pavement with my right foot. I did not step on the pavement with both feet but just my right foot. My left foot was on the dirt. I knew where the car took me when it struck me. It took me over to the telephone pole. Nobody picked me up and put me there. The first person I saw when I was lying there on the dirt near this pole was Phyllis Young. She came over to where I was lying. She said to me, 'Ora Mae'. She did not say anything else. Then Mr. Robbins came and picked me up and carried me half way up to home and Mamma came and met him and took me up to the house and then I was taken to the Lutheran Hospital."

The witnesses for the defendant were himself and his brother. The defendant testified:

"As I approached 38th Street from the west I was going slightly up grade. Several blocks west of 38th Street it is a sharper grade. I have observed this place at the time of the accident and since. If one stands at the mail boxes you can see down the pavement west about two blocks. On February 24th, there was some dirt on the pavement directly beside the mail boxes. I think these mail boxes are about two and a half feet from the edge of the pavement. I have been driving an automobile about ten years both in the city and country in all conditions of weather. As I left the Fair Grounds and went out University Avenue I was driving. My brother was sitting on the right-hand side. My car was a Model A Ford Coupé. Thirty-eighth Street comes down from the north, north of the pave-

ment. There is a bank on the north side. The road is cut down through it and is about ten feet wide. As I approached 38th Street and before I arrived at the place of the accident I was travelling about 25 miles an hour. I am familiar with the speed of automobiles from driving them. I saw these little girls. They were standing east of the mail box. When I first saw them they were not over fifty feet from me. They were not crossing the street, they were standing about two and a half feet from the pavement. They were just about straight east from the mail box. When I first saw them I blew my horn and slowed down but I did not come to a stop but continued to come along and after I blew my horn and approached these girls the tallest one was nearest me. From the time I blew my horn neither of these little girls moved from the position in which they were standing. After I got to the mail box to the immediate location of these children my car was not going over 15 miles per hour. I did not have the brake on at that time. I reached the mail box. When I was about five feet from these girls one of them ran out in front of me. It was the shorter one. She ran north. When she ran out the front end of my car was about five feet from her. I was driving about eighteen inches from the edge of the pavement. There was other traffic on the road and I was driving on the right-hand side of the pavement. The right wheels of my car were about 18 inches from the edge of the pavement. As I approached these little girls from the time I started to slow down and from the time I blew the horn these little girls looked north. They were just standing there. As I came along they were just standing there and up until this smaller girl ran out on the pavement neither of them had moved at all. The manner in which she entered the street was she ran. She ran from the point about two and a half feet off the pavement in a northerly direction. The right side of the front end of my car came in contact with her. I put my foot on the brake and stopped the car. My brakes were in good condition. From the time I saw her coming out until she came in contact with the car it was about a second. I did not turn in either direction because I didn't have time. At fifteen miles per hour and the condition of the pavement that day, with my brakes in good condition I could have brought my car to a stop in fifteen feet. I applied my brakes just as soon as I saw her start out. I did not get my brake clear to the floor. After the car struck the little girl

I stopped and got out and picked her up. Before she ran out, when I was at a distance of about five feet from her neither of these little girls gave me any warning that they were coming out. I put the brake on. Just as soon as she started out I started to brake. I don't know how many steps she had taken. I was not in any position to judge that. From the time I applied the brakes I stopped the car in fifteen feet. I stopped on the right half of the pavement. When I stopped the car I looked in the glass and she was lying just behind the car. I got out and carried her up to the electric light pole on the north side of the street. There is a sidewalk and curb there. I laid her on the ground. My brother was there with me. I saw Phyllis there that day. I do not remember whether she was there when I carried the girl over. My brother stayed there with this little girl while I moved my car off the pavement. I carried her up there and laid her on the ground as near as I can remember. The car was then standing on the right hand side of the pavement. I put it off the pavement on east a little ways. I got it off about 200 feet away. Then I went back where the little girl was lying and picked her up to carry her home and met her mother. I stopped at the house and I was there when the ambulance came."

The foregoing testimony of the defendant was in substantial accord with that of his brother, who testified to the same circumstances.

It appears from the testimony on both sides that the view to the west on the avenue extended about two blocks from where the little girls stood. The presence of the girls at the mail boxes was noticed by the defendant when he was about fifty feet distant. At that time they stood facing north apparently waiting for cars to pass. On the north side of the avenue, and at its junction with 38th Street, was a telephone pole close to the sidewalk, which extended north on 38th Street. This is the pole referred to in the testimony as the place where the plaintiff lay before she was carried to her mother. The witness, Phyllis, testified that the first she saw of the plaintiff after the accident was at that location. The plaintiff testified that the first person she saw after the accident was Phyllis, and that she saw her at that place. This evidence furnishes the keynote of the argument of appellant's counsel. This point was seventy-eight feet from the mail boxes. The argument is that the impact of the collision was so great as to project the body of the plaintiff over

that space; and further that the defendant was unable to stop his car within a distance of less than two hundred ninety-eight feet. Upon this hypothesis it is argued that the speed must have been excessive and uncontrollable. The trouble with this testimony is that it is in direct conflict with the physical facts. The distance of seventy-eight feet extended northerly more than easterly. The plaintiff testified that she was struck by the right bumper. If the impact of the car threw her forward, therefore, it would not be in a northerly direction. That the car did not drag her or "roll" her in that direction is indicated by the testimony of Phyllis to the effect that the car passed right on after the blow. It did not cross the street to the north. Moreover an impact that would project the person for a distance of seventy-eight feet could hardly have been less than fatal. The wheels of the defendant undoubtedly ran over the prostrate body, and this accounts for the fractured legs. There were no other injuries to her person. That the excitement of the moment had confused the memory of Phyllis is indicated by the further fact that she testified that Robbins did not return to the place where the plaintiff lay; whereas the plaintiff herself testified that he did. She was in his arms being carried home when they met her mother. It was out of his arms that her mother received her. This is not denied by the mother. Immediately following the accident Phyllis rushed to the plaintiff's home to tell the mother. This may account for her forgetfulness, if such, of some of the circumstances. In any event the record discloses no rational explanation of the presence of the plaintiff on the north side of the street after the accident except such as is made by the defendant. In the absence of other rational explanation, that of the defendant must be accepted. There was therefore no evidence of excessive speed or lack of caution or lookout as charged in the petition. The accident itself was distressing, but the court may not impose liability therefor upon the defendant unless he was responsible by some act of negligence on his part. Authorities on the question are quite abundant. But there is no controversy between the parties as to these. We see no legitimate avoidance of the conclusion reached by the trial court.

Its judgment is accordingly—Affirmed.

STEVENS, C. J., and ALBERT, KINDIG, and CLAUSSEN, JJ., concur.

BLISS, J. (dissenting.)—I have read the record with consider-

able care, and it seems to me that we should not say, as the trial court did, that the defendant was not negligent as a matter of law. Under the undisputed record, the plaintiff, who was then a few days under seven years old, and her little companion of ten years, were standing on the shoulder of the pavement two or three feet from the south curb line of University Avenue in East Des Moines. The paving on this avenue was 18 feet wide. They were standing near some mail boxes which were fastened on a 2x4 between two uprights on the shoulder two or three feet south of the south curb line. University Avenue runs east and west. Just a short distance east of these mail boxes, East 38th Street cut into University Avenue at right angles, but did not extend south of University Avenue. East 38th Street was a graded gravel or dirt road with a driveway some ten feet wide. It was sometime after the closing of school in the afternoon and the little girls, after getting off the school bus, had gone over to the mail boxes to see if there was any mail for their parents. There was none, and they stood in' the position above described, waiting for an opportunity to cross to the north side of University Avenue and proceed northward along 38th Street to their homes. The elder girl was standing to the west, holding the hand of the plaintiff, who stood just east of her. The evidence shows that they had looked westward, in which direction they could see but about two blocks, because of a hill. They saw no car approaching and looked eastward and saw no car approaching from that direction. The older girl said she was just turning to look west again when a car "slashed" right past her in front of her, and she said: "I heard Ora Mae's [the plaintiff's] lunch pail hit the pavement." She said that she then looked and saw the plaintiff on the dirt north of the pavement of University Avenue, and over by a telephone pole immediately east of 38th Street. She says she immediately ran over to the plaintiff and was the first one there, and that on calling her by name, the plaintiff turned and rolled over. She says that the plaintiff was carried to the place where she was lying by the defendant's car and that the defendant's car continued on eastward and stopped by a mail box about a half block east. The evidence shows that the place where the witness says the car stopped was 220 feet east of the place of the impact. This witness says that the defendant's car did not stop until it reached this point 220 feet east. She states that the defendant's car did not blow or sound any horn.

It is undisputed that both children before the collision were

standing facing and looking north. She says that the defendant's car went past her real fast. At another time, she testified that the defendant's car "squeezed" past her. The words "slashed" and "squeezed," as used by the little girl, are rather homely, but they are very expressive statements of what took place, the first expression indicating the extreme speed, and the second one, the close proximity of the defendant's car.

The plaintiff's father testified that it was 78 feet from the mail boxes to the pole where the elder girl says the plaintiff was carried or thrown by the car, and that it was 220 feet, by his measurement, to the place where defendant's car came to a stop. The plaintiff's testimony corroborates fully the testimony of the elder girl. She testified that when she stepped onto the pavement, she stepped only with her right foot, and that her left foot was on the dirt, that she knew where the car took her when it struck her, and that was over to the telephone pole, and that nobody picked her up and put her there, and that the first person she saw while she was lying on the dirt near the pole was the elder girl, and that the defendant came and picked her up and started to carry her to her home. The testimony of all of the witnesses was that the plaintiff was conscious at all times after she was struck and that she was crying and screaming.

The defendant's testimony is that he was driving eastward along University Avenue, which is otherwise known as Primary No. 63, to his home at Oskaloosa. His brother sat beside him in the front seat. He testified that one standing at the mail boxes could see westward down the pavement about two blocks. He and his brother state the little girls were standing east of the mail boxes, instead of west, as they testified. He states that when he first saw them, they were not over fifty feet from him, and that there was nothing in the way to have prevented his seeing them for a distance of about two blocks west. As he approached the scene of the accident, he says he was traveling about 25 miles an hour. He further states that the children were standing about $2\frac{1}{2}$ feet from the pavement, and that he blew his horn and slowed down, but did not come to a stop, and approached the girls at a speed of about fifteen miles an hour; that from the time he blew his horn, neither of the girls moved from the position in which they were standing; that he could see the size of the children and knew that they were both small children; that

there was nothing passed between him and the children until after the accident; that he blew his horn and the children "still stood looking to the north;" that he did not know whether the children heard the horn or not; that they never looked in the direction from which his car was coming, to his knowledge, and all the time he was approaching them. after he blew his horn, they continued to look north, and they did not look in his direction at all. He says that as he got within fifty feet of them, he reduced his speed, and that, as he says: "I expected them to go across if they didn't hear me probably." "I don't know whether they heard the horn or not. I didn't know what they was going to do." He says that as he approached the mail boxes, he was not going over fifteen miles an hour; that he did not have the brake on at that time, and when he was about five feet from these girls, the shorter one ran north in front of him; and that at that time, he was driving about 18 inches from the edge of the paving, and the right wheels of his car were about 18 inches from the edge of the pavement; that during all the time as he approached these girls and from the time he blew his horn, they looked north; that they were just standing there; that the little girl ran from the point about 2½ feet off the pavement in a northerly direction, and that the right side of the front end of his car struck her; that he put his foot on the brake and stopped the car; that his brakes were in good shape and the car had four-wheel brakes; that just as the plaintiff ran out, he says:

"I put my foot on the brake. From the time I saw her coming out until she came in contact with the car, it was about a second. * * * At fifteen miles per hour and the condition of the pavement that day, with my brakes in good condition, I could have brought my car to a stop in fifteen feet. I applied my brakes just as soon as I saw her start out."

He states that he did stop the car within fifteen feet after he hit the girl. He states he stopped the car on the right half of the pavement, and that after he stopped the car, he looked in the glass, and she was lying just behind the car. The evidence fails to disclose whether he had a side mirror or the customary mirror above the windshield. If it was the latter, it is fair to assume that the body of the child must have been lying much more than fifteen feet behind his car; otherwise, her body would not have been reflected in such mirror. He states that after stopping the car, he got out and

carried the little girl northeast across the pavement and laid her on the ground near the pole, and that his brother then stayed there with the little girl while he moved his car off the pavement; that the car was then standing on the right-hand side of the pavement, but he moved it east about 200 feet off the paving; that he then came back and carried the little girl, who was crying, to the home of her mother. There was nothing to the contrary in the testimony of the defendant's brother.

Under this record, should the court say that as a matter of law the defendant was not negligent? I cannot bring myself to think so. There is a direct conflict between the testimony of the two little girls and the testimony of the defendant and his brother. There are circumstances which strongly corroborate the testimony of the little girls. If their testimony is to be believed, the defendant was driving at an excessive rate of speed under the circumstances. He was approaching an intersection where, under the provisions of Section 5031 of the Code, he should have reduced the speed to a reasonable and proper rate, and had control of the car. If the defendant's car struck the plaintiff and carried her to the point near the telephone pole and then proceeded on 220 feet, it was certainly going at an improper rate of speed and was not under the control of the defendant.

The direction which the elder little girl claimed the car took after striking the plaintiff is the direction which the car naturally would have taken under the circumstances. When the defendant saw the plaintiff step in front of the car, he naturally would have tried to swerve the car to the left to avoid her, because if he had attempted to turn to the right, he would likely have struck the other little girl. If he did swerve to the left and the car continued on, it would go directly towards the telephone pole, and if the speed of the car was great enough, or if the driver was excited, the car might well have continued on to the point where the elder girl said it did continue. What is there in the record that contradicts the plaintiff's contention on this point? The defendant says that after striking the plaintiff, the car proceeded directly east for a space of fifteen feet and stopped on the right side of the paving. If it did stop in that position, why the great hurry to take it from that position where the car was safely parked, so far as other traffic was concerned, and drive it 200 feet east? This seems a rather strange performance,

in view of the fact that the little girl with her legs badly broken was screaming with pain and needing the promptest attention. He said that he picked the little girl up and laid her down and told his brother to watch her while he took the car from a place where it was safely parked and moved it 200 feet. His brother testified that he was able to drive a car and did drive a Ford. Why didn't the brother remove the defendant's car while the defendant took the plaintiff to her home or elsewhere? It will hardly do to say that it was not safe for him to leave his car parked where he says he stopped it after the collision because of the traffic, because, no doubt, as usually happens in such cases, the highway was pretty thoroughly blocked on both sides, as approaching cars stopped to see what the trouble was. In any event, prompt attention to the child was much more urgent than any dangers that might threaten by leaving the car parked on the paving; but leaving aside entirely the question of speed, it seems to me that the defendant was very negligent in the operation of his car prior to hitting the child. The occasion is a very rare one when a motorist is blameless in striking a child that he sees standing along the curbing for any considerable distance before he reaches the spot. To my mind, the defendant was negligent in proceeding to drive by these two children within 18 inches of the curbing and but about 3 or 4 feet from the place where they were standing, even though he was going about fifteen miles an hour, as he claims. These children were in the range of his vision for 300 feet or more. He might have seen them much earlier than he did, but he admits he saw them when he was 50 feet from them. He states that he sounded his horn, but the children say they didn't hear it. He admits that they gave no evidence of hearing the horn, and that during the time he was approaching them, after he sounded his horn, they never once looked in his direction, but at all times stood facing the north. He had reason to believe that they did not know of his approach. He knew they were children, with all the propensities of children. He knew, or should have known, that a child of seven years might have done the very thing which the plaintiff did do. How many times, in the experience of every parent, has a child under those circumstances, or in crossing a street, broken and run away from the parent? As he states, they never looked in his direction at all and he expected them to go across, if they didn't hear him; that he didn't know whether they heard the horn or not; that he didn't know what they were going to do. Under

those circumstances, I would say that he had reason to expect that they might do the very thing which the little girl did do. When a motorist drives his automobile at a speed of fifteen miles an hour 18 inches from the curb line immediately behind which a seven-year-old child is standing, to his knowledge, within plain view, the question of his negligence should be left to the jury.

What does the ordinarily reasonable and careful motorist do when he is driving his car along a highway and he sees school children of various ages going to or from school ahead of him on his side of the highway? Why, he sounds his horn and pulls as far to the left as the traffic conditions will permit him. That is what a careful driver would do; but this defendant, instead of doing that, attempted to "squeeze" by, as the little girl said, although there is nothing to indicate that there were any cars approaching from the east which prevented him from pulling to the left towards the middle of the paving. I dare say that if, in the place of the children, a cow or a horse or a hog had been standing, the defendant would not have driven within 3½ feet of its position. These children were entitled to as much consideration.

If the defendant had seen a drunken man walking unsteadily toward him, or a blind man feeling his way along the pavement toward him with a cane, and he had driven as closely to either as he did to this seven-year-old child, would there be any question in the mind of any reasonable man of his negligence? I think not. I feel very seriously that the jury should have been permitted to pass upon the issues in this case. To my mind, it cannot be said that all reasonable minds must agree that the defendant was not negligent under the record in this case.

The defendant further testified, from the time he saw her coming out until she came in contact with the car, "It was about a second." He may perhaps have been mistaken as to just how long it was, but he also may have been mistaken when he said that she jumped in front of the car when he was but five feet away. If we accept his last statement as true, we must also accept his first statement that a second elapsed between the time he saw the plaintiff and when he struck her. If he was going fifteen miles an hour, which he states was his speed,—and, without question, he gave himself the benefit of every doubt in his favor,—he was traveling 22 feet in a second. If he was able to and did stop the car within 15

feet, the jury should at least say why he didn't stop it within the 22 feet that elapsed in that second; and his own testimony discloses that he put on the brake just as soon as he saw her step from the curbing.

I would reverse.